**FILED**

FEB 2 4 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

# UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | |
|---|---|
| SUPERIOR JEWELRY COMPANY,<br>9949 Global Road,<br>Philadelphia, Pennsylvania 19115,<br>individually and on behalf of all others<br>similarly situated,<br><br>        Plaintiff,<br><br>v.<br><br>AIR FRANCE ADS, AIR FRANCE-KLM<br>GROUP ADS, AIR FRANCE CARGO<br>ADS, AIR FRANCE-KLM CARGO ADS,<br>ASIANA AIRLINES INC., BRITISH<br>AIRWAYS PLC, CATHAY PACIFIC<br>AIRWAYS LTD., DEUTSCHE<br>LUFTHANSA AG, LUFTHANSA<br>CARGO AG, JAPAN AIRLINES<br>INTERNATIONAL COMPANY LTD.,<br>KOREAN AIRLINES COMPANY LTD.,<br>SAS AB dba. SAS GROUP, SAS CARGO<br>GROUP A/S, UAL CORPORATION,<br>UNITED AIRLINES INC., UNITED<br>AIRLINES CARGO INC.,<br>INTERNATIONAL AIR TRANSPORT<br>ASSOCIATION, and JOHN DOES I-X,<br><br>        Defendants. | Civil Action No. _____<br><br>**CLASS ACTION COMPLAINT**<br><br><br>**JURY TRIAL DEMANDED** |

```
CASE NUMBER  1:06CV00333
JUDGE: Henry H. Kennedy
DECK TYPE: Antitrust
DATE STAMP: 02/24/2006
```

*JURY ACTION*

        Plaintiff, on behalf of itself and all others similarly situated, brings this action for treble damages and injunctive relief under the federal antitrust laws of the United States, Section 1 of the Sherman Antitrust Act of 1890, 15 U.S.C. § 1 ("Sherman Act") and Section 4 of the Clayton Antitrust Act of 1914, 15 U.S.C. § 15 ("Clayton Act") against Defendants. Plaintiff complains and alleges upon information and belief except as to those paragraphs applicable to the named Plaintiff, which are based on personal knowledge, as follows:

1

## NATURE OF THE ACTION

1.      This action arises from a global conspiracy to fix, raise, maintain, and/or stabilize prices for fuel, security and insurance surcharges in air cargo shipping ("Airfreight Shipping"). Surcharges are charged by major airlines acting as Airfreight Shipping providers ("Airfreight Carriers") that deliver the cargo placed by their customers, companies or individuals seeking to transport freight via air on behalf of themselves or others ("Airfreight Customers"). The Surcharges are fees charged to Airfreight Customers purportedly to compensate the Airfreight Carriers for certain external costs including increased costs for fuel, for additional security measures after the attack in the U.S. in September 2001, for war-risk insurance premiums applied in conjunction with the outbreak of war in Iraq in 2003, and for other external costs (collectively the "Surcharges").

2.      Plaintiff, on behalf of all persons and entities that purchased airfreight cargo shipping services, for shipments within or to or from the United States, directly from any of the Defendants and their co-conspirators or any predecessor, subsidiary, or affiliate of each, at any time during the period from no later than January 1, 2000 to the present (the "Class"), brings this action to recover treble damages and injunctive relief for violations of the United States antitrust laws. At all relevant times herein, Defendants were Airfreight Carriers that charged Surcharges to Airfreight Customers in the United States and throughout the world. As further alleged herein, during at least the period January 1, 2000 through the present (the "Class Period"), Defendants agreed, combined, and conspired with each other to fix, raise, maintain, and/or stabilize Surcharges. As a result of Defendants' unlawful conduct and conspiracy, Plaintiff and the other members of the Class paid artificially high Surcharges and have been damaged thereby.

2

## JURISDICTION AND VENUE

3.    This Complaint is brought under Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26, to obtain injunctive relief and to recover treble damages and the costs of this suit, including reasonable attorneys' fees, against Defendants for the injuries sustained by Plaintiff and the members of the Class by reason of Defendants' violations of Section 1 of the Sherman Act, 15 U.S.C. § 1.

4.    This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1337, and Sections 4 and 16 of the Clayton Act, 15 U.S.C. §§ 15 and 26.

5.    This Court has *in personam* jurisdiction over each of the Defendants because each was engaged in an illegal price-fixing scheme and conspiracy that was directed at and/or caused injury to persons and entities residing in, located in, or doing business in the District of Columbia and throughout the United States.

6.    Venue is proper in this judicial district pursuant to 15 U.S.C. § 22 and 28 U.S.C. § 1391(b), (c), and (d) because during the Class Period one or more of the Defendants resided, transacted business, was found, or had agents in this district, and because a substantial part of the events giving rise to Plaintiff's claims occurred, and a substantial portion of the affected interstate trade and commerce described below has been carried out, in this district.

7.    No other forum would be more convenient for the parties and witnesses to litigate this case.

## PARTIES

8.    Plaintiff Superior Jewelry Company ("Superior") was at all relevant times an Airfreight Customer with its principal place of business at 9949 Global Road, Philadelphia, Pennsylvania 19115. At all relevant times, Superior purchased airfreight cargo shipping services, for shipments within or to or from the United States, directly from the Defendants

3

during the Class Period, and has suffered significant pecuniary injury as a result of the antitrust violations alleged herein.

9.      Defendant Air France ADS ("Air France") is a foreign airline headquartered at 45, rue de Paris 95747 Roissy-CDG Cedex, France, with a U.S. office in this district at 1120 Connecticut Avenue Northwest Suite 1050, Washington, DC 20036. Air France conducts Airfreight Shipping throughout the world, including into the U.S. and this district. Air France is a subsidiary of Air France-KLM Group ADR. On information and belief, at all relevant times, the business of Air France was owned, dominated and controlled by Air France-KLM Group ADR.

10.     Defendant Air France-KLM Group ADS ("Air France-KLM") is a foreign airline headquartered at 45, rue de Paris 95747 Roissy-CDG Cedex, France, and maintains a U.S. office in this district at 1120 Connecticut Avenue Northwest Suite 1050, Washington, DC 20036. Air France-KLM conducts Airfreight Shipping throughout the world, including into the U.S. and this district.

11.     Defendant Air France Cargo ADS ("Air France Cargo") is a foreign airline headquartered at 45, rue de Paris 95747 Roissy-CDG Cedex, France, with a U.S. office in this district at 1120 Connecticut Avenue Northwest Suite 1050, Washington, DC 20036. Air France Cargo conducts Airfreight Shipping throughout the world, including into the U.S. and this district. Air France Cargo is a subsidiary of Air France-KLM. On information and belief, at all relevant times, Air France-KLM owned, dominated and controlled the businesses of Air France Cargo.

12.     Defendant Air France-KLM Cargo ADS ("Air France-KLM Cargo") is a foreign airline headquartered at 45, rue de Paris 95747 Roissy-CDG Cedex, France, with a U.S. office in this district at 1120 Connecticut Avenue Northwest Suite 1050, Washington, DC 20036. Air-France-KLM Cargo conducts Airfreight Shipping throughout the world, including into the U.S.

4

and this district. Air France-KLM Cargo is a subsidiary of Air France-KLM. On information and belief, at all relevant times, Air France-KLM owned, dominated and controlled the business of Air France-KLM Cargo.

13.    Defendants identified in paragraphs 9-12 above are together referred to herein as the "Air France Defendants."

14.    Defendant Asiana Airlines Inc. ("Asiana Airlines") is a foreign airline headquartered at Asiana Twon Kangseo, P.O. Box 98 #47, Osae-Dong, Kangseo-Ku, Seoul, South Korea. Asiana conducts Airfreight Shipping throughout the world, including into the U.S. and this district.

15.    Defendant British Airways PLC ("British Airways") is a foreign airline headquartered at Waterside, UB7 GB Harmondsworth, Middlesex, England, with a U.S. office in this district at Dulles International Airport, Cargo Building 3, Door 115, Washington, DC 20041. British Airways conducts Airfreight Shipping throughout the world, including into the U.S. and this district. British Airways' cargo division is named British Airways World Cargo.

16.    Defendant Cathay Pacific Airways Ltd. ("Cathay Pacific") is a foreign airline headquartered at Hong Kong International Airport, 7/F North Tower, 8 Scenic Road, Cathay City, Lantau, Hong Kong. Cathay Pacific conducts Airfreight Shipping throughout the world, including into the U.S. and this district.

17.    Defendant Deutsche Lufthansa AG ("Lufthansa AG") is a foreign airline headquartered at Von-Gablenz-Strasse 2-6, 50679 Köln, Germany, with a U.S. office in this district at 1101 Connecticut Ave. NW, Washington DC 20036. Lufthansa AG conducts Airfreight Shipping throughout the world, including into the U.S. and this district.

18.    Defendant Lufthansa Cargo AG ("Lufthansa Cargo") is a foreign airline headquartered at Von-Gablenz-Strasse 2-6, 50679 Köln, Germany, and holds a U.S. office in this district at 1101 Connecticut Ave. NW, Washington DC 20036. Lufthansa Cargo conducts

5

Airfreight Shipping throughout the world, including into the U.S. and this district. Lufthansa Cargo is a subsidiary of Lufthansa AG. On information and belief, at all relevant times, Lufthansa AG owned, dominated and controlled the business of Lufthansa Cargo.

19.     Defendants identified in paragraphs 17-18 above are together referred to herein as the "Lufthansa Defendants."

20.     Defendant Japan Airlines International Company Ltd. ("JAL") is a foreign airline headquartered at 4-11, Higashi-shinagawa 2-chome, Shinagawa-ku, Tokyo 140-8637, Japan, with a U.S. office in this district at 1050 Connecticut Ave., N.W., Suite 200, Washington, DC 20036. JAL conducts Airfreight Shipping throughout the world, including into the U.S. and this district. JAL's cargo division is named JAL Cargo.

21.     Defendant Korean Air Company, Ltd. ("Korean Air") is a foreign airline headquartered at 1370 Gonghang-Dong, Gangso-Gu, Seoul, Korea. Korean Air conducts Airfreight Shipping throughout the world, including into the U.S. and this district.

22.     Defendant SAS AB, dba. SAS Group ("SAS Group") is a foreign airline headquartered at Frösundaviks Allé 1, 195 87 Stockholm, Sweden with a U.S. office in this district at Ronald Reagan Washington National Airport, Washington, DC 20001. SAS Group conducts Airfreight Shipping throughout the world, including into the U.S. and this district.

23.     SAS Cargo Group A/S ("SAS Cargo") is a foreign airline headquartered at Frösundaviks Allé 1, 195 87 Stockholm, Sweden, with a U.S. office in this district at Ronald Reagan Washington National Airport, Washington, DC 20001. SAS Cargo conducts Airfreight Shipping throughout the world, including into the U.S. and this district. SAS Cargo is a subsidiary of SAS Group. On information and belief, at all relevant times, SAS Group owned, dominated and controlled the business of SAS Cargo.

24.     Defendants identified in paragraphs 22-23 above are together referred to herein as the "SAS Defendants."

6

25.    Defendant UAL Corporation ("UAL") is a U.S.-based airline headquartered at 1200 E. Algonquin Rd., Elk Grove Township, Illinois, with an office in this district at Ronald Reagan Washington National Airport, Washington, DC 20001.  UAL conducts Airfreight Shipping throughout the world, including into the United States and this district.

26.    Defendant United Airlines Inc. ("United Airlines") is a U.S.-based airline headquartered at 1200 E. Algonquin Rd., Elk Grove Township, Illinois, with an office in this district at Ronald Reagan Washington National Airport, Washington, DC 20001. Unites Airlines conducts Airfreight Shipping throughout the world, including into the United States and this district.  United Airlines is a subsidiary of UAL.  On information and belief, at all relevant times, UAL owned, dominated and controlled the business of United Airlines.

27.    Defendant United Airlines Cargo Inc. ("United Cargo") is a U.S.-based airline headquartered at 1200 E. Algonquin Rd., Elk Grove Township, Illinois, with an office in this district at Ronald Reagan Washington National Airport, Washington, DC 20001.  United Cargo conducts Airfreight Shipping throughout the world, including into the United States and this district.  United Cargo is a subsidiary of Defendant United Airlines Inc.

28.    On information and belief, at all relevant times, United Airlines owned, dominated and controlled the business of United Cargo.

29.    On information and belief, at all relevant times, UAL owned, dominated and controlled the business of United Cargo.

30.    Defendants identified in paragraphs 25-27 above are together referred to herein as the "United Defendants."

31.    Defendants identified in paragraphs 9-12, 14-18, 20-23, and 25-27 above are together referred to herein as the "Airfreight Carrier Defendants."

7

32.    Defendant International Air Transport Association ("IATA") is an international trade association with its U.S. headquarters located in this district at 1776 K Street N.W., Suite 400, Washington DC 20006.

33.    At all relevant times, all Airfreight Carrier Defendants named above were members of IATA.

## UNNAMED CO-CONSPIRATORS

34.    On information and belief, at all relevant times, other Airfreight Carriers, trade groups, or other entities, referred to herein as John Does I-X, willingly conspired with Defendants in their unlawful restraint of trade. All averments herein against named Defendants are also averred against these unnamed co-conspirators as though set forth at length.

## AGENTS

35.    The acts alleged to have been done by Defendants were authorized, ordered or done by their directors, officers, agents, employees, or representatives while actively engaged in the management of each of the Defendants' affairs.

## INTERSTATE TRADE AND COMMERCE

36.    The global market for Airfreight Shipping is $60 billion, and estimated to grow at a rate of greater than 6 percent per annum over the next twenty years.

37.    Throughout the Class Period, there was a continuous and uninterrupted flow of transactions and shipments in Airfreight Shipping in interstate and international commerce throughout the United States and the world.

38.    Defendants' unlawful activities, as described herein, took place within the flow of interstate commerce to Airfreight Customers located in states other than the states in which Defendants are located, as well as throughout the world, and had a direct, substantial and reasonably foreseeable effect upon interstate and international commerce.

8

## CLASS ACTION ALLEGATIONS

39.     Plaintiff brings this action on its own behalf and as a class action pursuant to

Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of the following Class:

> All individuals or entities (excluding governmental entities, Defendants, and their
> parents, predecessors, subsidiaries, affiliates, and their co-conspirators) who
> purchased airfreight cargo shipping services, for shipments within or to or from
> the United States, directly from any of the Defendants and their co-conspirators or
> any predecessor, subsidiary, or affiliate of each, at any time during the period
> from no later than January 1, 2000 to the present.

40.     Because such information is in the exclusive control of Defendants, Plaintiff does

not know the exact number of Class members. Due to the nature of the trade and commerce

involved, however, Plaintiff believes that Class members number at least in the thousands and

are sufficiently numerous and geographically dispersed throughout the United States and the

world so that joinder of all Class members is impracticable.

41.     There are questions of law or fact common to the Class, including:

    a.     Whether Defendants engaged in a combination or conspiracy among

themselves to fix, raise, maintain, and/or stabilize Surcharge prices charged in the United States

and throughout the world;

    b.     The duration of the conspiracy alleged in this Complaint and the nature

and character of the acts performed by Defendants in furtherance of the conspiracy;

    c.     Whether the alleged conspiracy violated Section 1 of the Sherman Act;

    d.     Whether the conduct of Defendants, as alleged in this Complaint, caused

injury to the businesses or property of Plaintiff and the other members of the Class;

    e.     The effect of Defendants' conspiracy on the Surcharge prices charged in

the United States and throughout the world during the Class Period; and

    f.     The appropriate measure of damages sustained by Plaintiff and other

members of the Class.

9

42.     Plaintiff is a member of the Class. Plaintiff's claims are typical of the claims of the Class members. Plaintiff will fairly and adequately protect the interests of the Class. Plaintiff directly paid Surcharges to one or more Defendants, and its interests are coincident with and not antagonistic to those of other members of the Class. Plaintiff is represented by counsel competent and experienced in the prosecution of antitrust and class action litigation.

43.     The questions of law and fact common to the members of the Class predominate over any questions affecting only individual members.

44.     A class action is superior to other methods for the fair and efficient adjudication of this controversy. Treatment as a class action will permit a large number of similarly situated persons to adjudicate their common claims in a single forum simultaneously, efficiently, and without the duplication of effort and expense that numerous individual actions would engender. Class treatment will also permit the adjudication of relatively small claims by many Class members who otherwise could not afford to litigate an antitrust claim such as is asserted in this Complaint. This class action presents no difficulties in management that would preclude maintenance as a class action. Finally, the Class is readily definable and is one for which records of the names and addresses of the members of the Class exist in the files of Defendants.

## DEFENDANTS AND THE AIRFREIGHT SHIPPING MARKET

45.     According to the IATA, the global market for airfreight transport is $60 billion. The IATA also has stated that global freight traffic rose by about 3 per cent 2004- 2005.

46.     The International Air Cargo Association ("IACA") has estimated the airfreight industry will expand at an average annual rate of 6.5 per cent in the next two decades, exceeding the expected growth rates of passenger traffic and the world economy. Plane maker Boeing Co. estimated a similar number, that the cargo market will expand by 6.2 percent per year for that period.

47.    Airfreight Shipping accounts for about 40 percent of all global cargo shipments, according to the IACA, and 13 percent of total air traffic revenue. IATA members, which all Defendants are, carry more than 40 million tons of cargo annually.

48.    Between 2000 and 2006, Defendants together handled an overwhelming percentage of this business. Among the named Defendants are all three of the world's top four airfreight carriers (Defendant Korean Air, the Lufthansa Defendants, and Defendant Cathay Pacific, respectively) in terms of revenue or Freight Ton-Kilometers ("FTK").

49.    Defendants possess significant market share:

   a.    In 2004 Defendant Air France merged with Defendant KLM, creating Defendant Air France-KLM, now Europe's largest airline.

   b.    Defendant Air France's cargo unit, Defendant Air France Cargo, was itself the world's fifth-largest airline for air cargo transport; it then integrated its commercial activities with Defendant KLM Cargo, creating an even-larger entity, Defendant Air France-KLM Cargo.

   c.    Defendant Asiana Airlines' cargo routes serve 16 countries and 24 Cities, on 21 routes. Asiana Airlines' cargo revenue was 29 percent of its total sales in 2004.

   d.    Defendant British Airways is one of the top ten leading cargo airlines in the world and the United Kingdom's largest airfreight carrier.

   e.    Defendant Lufthansa Cargo is the world's second-biggest international airfreight carrier. In 2004 the Lufthansa Defendants transported more than 1.75 million tons of freight and mail.

   f.    For the October-December quarter of 2005, Defendant JAL's revenue in international cargo totaled 53.2 billion yen ($451 million), about 10 percent of JAL's overall revenue for that period.

   g.    Defendant Korean Air's cargo division, Korean Air Cargo, is the world's largest commercial airline cargo enterprise; during 2004, Korean Air shipped 8.164 billion FTK. Cargo revenue was 32.7 percent of Korean Air's total sales in 2004.

   h.    Revenues for 2004 for Defendant SAS Cargo were $7.1 billion.

   i.    In 2002, the United Defendants' reported cargo revenue totaled $673 million.

11

50.    The principal competitors for the Defendants in this global Airfreight Shipping services market are one another.

51.    Airfreight Shipping services are a commodity product that are fungible in the sense that Airfreight Shipping services provided by any one Airfreight Carrier are readily substitutable for the Airfreight Shipping services provided by any other Airfreight Carrier.

52.    Airfreight Shipping services are homogenous services sold by Airfreight Carriers, including Defendants, to Airfreight Customers, including Plaintiff and the members of the Class, primarily based on price.

53.    The Airfreight Shipping service market in the U.S. and worldwide is highly concentrated, and there exist substantial barriers to entry in this market; both factors facilitate the implementation and maintenance of a horizontal price-fixing cartel such as that perpetrated by Defendants and alleged herein.

## DEFENDANT IATA FACILITATED THE CONSPIRACY

54.    IATA is an association whose members include over 270 airlines from more than 140 nations worldwide. Flights by IATA member airlines comprise 94 percent of all international scheduled air traffic. In 2003 IATA Airfreight Carrier members carried more than 34.3 million tons of cargo; by 2005 this figure had grown to 40 million.

55.    According to its website, IATA is the "prime vehicle for inter-airline cooperation."

56.    Defendant IATA was aware of the Airfreight Defendants' Surcharge conspiracy, and participated in, coordinated, facilitated, and/or ratified the conspiracy and the illegal acts of the Airfreight Carrier Defendants as averred herein.

## GLOBAL AIRLINE ALLIANCES FACILITATED CONCERTED ACTION

57.    Several global airline alliances exist to which multiple Defendants belong. These alliances facilitate cooperation between Defendants in determining, instituting, enforcing, and communicating about the Surcharges and their increases.

### WOW

58.    "WOW," a/k/a "New Global Cargo," is an alliance between four Airfreight Carriers founded in April 2002, six months after the 9/11 attacks. Two of the founding members are Defendants: Lufthansa Cargo and SAS Cargo. The third founder, Singapore Airlines, was another Airfreight Carrier contacted by antitrust authorities in connection with the ongoing global price-fixing investigation.

59.    According to the WOW press release at the alliance's announcement (http://www.wowtheworld.com/news_press6.html), WOW was expected to provide Airfreight Customers a portfolio of *"harmonized"* air cargo products, and *"synchronized"* sales and customer service activities. The alliance's offerings were intended to provide greater *"consistency."* In short, the release concluded, the alliance "establishes *even closer links* between the three cargo carriers."

60.    In July 2002 yet another Defendant, JAL Cargo, joined WOW.

61.    By August 2003, WOW had captured a global market share of about 20 percent, making it the world's biggest air cargo alliance. The air cargo alliance currently holds a worldwide network of 523 destinations in 103 countries, a combined fleet of 43 freighters, and the "bellyhold" capacity of more than 760 passenger aircraft. WOW is also introducing its own dedicated airport terminals, as well as its own cargo jets.

62.    WOW facilitated cooperation between these Defendants in determining, instituting, enforcing, and/or communicating about the Surcharges and their increases.

13

## Star Alliance

63.    Star Alliance is a global airline alliance dating from 1994 whose members include the following Defendants: Asiana; the Lufthansa Defendants; the SAS Defendants; JAL; and the United Defendants.

64.    Star Alliance facilitated cooperation between these Defendants in determining, instituting, enforcing, and/or communicating about the Surcharges and their increases.

## SkyTeam Cargo

65.    SkyTeam Cargo is a global Airfreight Carrier alliance whose members include Defendants Air France Cargo and Korean Air Cargo.

66.    SkyTeam Cargo facilitated cooperation between these Defendants in determining, instituting, enforcing, and/or communicating about the Surcharges and their increases.

## DEFENDANTS' CONCERTED SURCHARGES

67.    Generally, surcharges are a feature of global freight transportation, in which freight carriers, including Airfreight Carriers such as Defendants, negotiate to charge extra fees to their shipping customers, above and beyond basic freight charges typically priced by weight or volume, with the intent of defraying certain external costs of the carriers.

## Fuel Surcharge

68.    Beginning on or about January 1, 2000, Defendants agreed to act in concert with one another in demanding the Surcharges, including a fuel cost surcharge ("Fuel Surcharge"), from their Airfreight Customers.

69.    Defendants implemented their agreement by exchanging information both in secret and by publicly announcing agreed-upon surcharge increases, and by privately exchanging information including Airfreight Customers' total airfreight costs charged within and to-and-from the United States and elsewhere, for the purpose of monitoring and enforcing the agreed-upon surcharge levels.

70.    For example, according to some industry commentators, the Lufthansa Cargo Fuel Index is used by much of the air freight industry as a benchmark for adjusting fuel surcharge levels.

71.    Lufthansa's Fuel Index is published daily on the Lufthansa website, and is tied to the spot fuel prices in five geographic markets. Until August 2005 the Index's methodology stated that if their index number remained over 365 for two consecutive weeks, the airline would increase its fuel surcharge by $.05 USD/kg to a new level of $.55 USD/kg or EUR/kg.

72.    Lufthansa's methodology was easily followed by all Defendants, with the result of nearly identical Fuel Surcharges from all Defendants. For example, according to travel industry analyst Christopher Elliot, in 2002 a United Airlines spokesman responded to a reporter's question on the disparity between Surcharges and actual external costs by saying *"**We charge what everyone else charges . . . .**" See* Christopher Elliott: *A Profit 'Surcharge,'* Elliott Publishing, March 1, 2002, at 1 (emphasis supplied).

73.    On or about July 4, 2005 Defendant Lufthansa and others announced lockstep increases to their Fuel Surcharges, to $.45 per kilogram.

74.    On or about August 31, 2005, several Defendants implemented their Fuel Surcharge increases, including British Airways, the Lufthansa Defendants, and the Air France Defendants.

75.    To increase even further the profits yielded to Defendants by applying the publicly available Lufthansa Fuel Surcharge, Lufthansa announced publicly on August 22, 2005, that the airline had added new levels to its fuel index. Under the new added index methodology, if their index number remains over 390 for two consecutive weeks, the airline will increase its fuel surcharge to a new level of $.60 USD/kg or EUR/kg. The index today stands nearly 40 percent ahead of where it stood one year ago.

76.    But for Defendants' Airfreight Carrier cartel, Defendants would have been unable to perpetrate the extent to which they increased the prices of their Fuel Surcharges.

77.    Due to Defendants' concerted action, prices of the Fuel Surcharges charged to Airfreight Customers were raised to or maintained at supra-competitive levels throughout the Class Period.

### Security Surcharge

78.    The Defendants' Surcharge scheme expanded and intensified following the Al Qaeda attacks upon the United States on September 11, 2001, when Defendants opportunistically agreed to further leverage their cartel power to charge their Airfreight Customers still more and higher Surcharges.

79.    Following the 9/11 attacks Defendants together demanded of their Airfreight Customers higher Fuel Surcharges, and additionally instituted a new type of Surcharge, purportedly to offset costs for additional airline security measures such as reinforced walls between cockpits and cabins ("Security Surcharge").

80.    Defendants were able to facilitate and continue this additional Security Surcharge agreement throughout the Class Period by exchanging information on the Security Surcharges both in secret and by publicly announcing agreed-upon Surcharge increases.

81.    Lufthansa led the way in using the press to signal the inception of their Security Surcharge. An IACA article from that period indicates the concerted action of the dominant Airfreight Carriers by stating that Lufthansa Cargo would:

> impose a security surcharge of 10 cents per kilo on airborne exports from the U.S., effective Oct. 8. The surcharge for shipments from Europe will be €0.15 per kilo. Cargolux Airlines [an Airfreight Carrier also contacted by antitrust authorities in connection with the ongoing global price-fixing investigation] is also imposing a surcharge of €0.15 per kilogram, effective Oct. 8. The surcharge for shipments from the U.S. will be 15 cents per kilo. Air France Cargo officials are expected to decide Tuesday what kind of surcharge, if any, they will be putting in place.

http://www.tiaca.org/articles/2001/10/02/ A97C93DB38D24219B3A300B1
A9C9E04.asp.

82.    But for Defendants' Airfreight Carrier cartel, Defendants would have been unable to institute, implement or facilitate this Security Surcharge, or to perpetrate the extent to which they increased the prices of their Security Surcharges.

83.    Due to Defendants' concerted action, the Defendants' Security Surcharges were implemented and charged to Airfreight Customers at supra-competitive price levels throughout the Class Period.

### War Risk Surcharge

84.    Following the outbreak of the war in Iraq in 2003, Defendants again seized upon what would be for them a profitable turn in world events and agreed to together demand still-higher Fuel Surcharges and Security Surcharges, and also to institute another new Surcharge.

85.    At the start of aggressions in Iraq, Defendants agreed to and did concertedly institute a new Surcharge, with the purported purpose of offsetting increased costs of war-risk insurance premiums ostensibly applied to the airlines by insurance providers in conjunction with that war ("War Risk Surcharge").

86.    Defendants were again able to facilitate and continue this additional War Risk Surcharge agreement throughout the Class Period by exchanging information on the agreed-upon War Risk Surcharge increases.

87.    But for Defendants' Airfreight Carrier cartel, Defendants would have been unable to institute, implement or facilitate their War Risk Surcharges, or to perpetrate the extent to which they increased the prices of their War Risk Surcharges.

88.    Due to Defendants' concerted actions, the Defendants' Security Surcharges were implemented and charged to Airfreight Customers at supra-competitive price levels throughout the Class Period.

17

## DEFENDANTS PROFITED FROM THE SURCHARGES

89.    Because surcharges generally are designed to compensate for increased external costs, they should bear a relatively constant relationship to external cost levels. Thus, in a competitive market, when the costs of jet fuel, security costs, or war risk insurance premiums fall, surcharges should fall as well, at relatively constant ratios to the associated.

90.    But since approximately 2000, the ratio of Defendants' Surcharges to external costs has increased steadily. For example, as of March 2002, when the cost of a gallon of jet fuel plummeted to $.55, compared with $.85 one year prior, Defendants' Fuel Surcharge prices remained at a proportionately higher level.

91.    According to *Bloomberg News*, cargo airlines often work together to carry freight, setting aside as much as 10 percent of space for partners. For example, Defendant Lufthansa and Swiss Airlines, an Airfreight Carrier also contacted by antitrust authorities in connection with the ongoing global price-fixing investigation, concluded an agreement in late 2005 for capacity cooperation.

92.    As Defendants controlled a vast majority of the Airfreight Shipping services during the Class Period with their dominant combined market-share, compounded by the Airfreight Carriers' self-imposed supply restriction in the form of their ten percent cargo capacity reservation for other carriers, Airfreight Customers were unable to shop their freight shipment purchases to lower-charging carriers during that period, which allowed Defendants to reap enormous profits from these Surcharges.

93.    The ratio of Defendants' profits to external costs was therefore quite high due to the concerted implementation and maintenance of the agreed-upon Surcharge levels. So despite record fuel costs in 2005, Defendants' Surcharges were actually responsible for outstanding **profit growth** for Defendants. According to *Bloomberg*, for example, Lufthansa stated in January 2006 that its "2005 operating profit surged 44 percent to about 550 million euros **because of fuel**

18

*surcharges*." Andrea Rothman: "Air France-KLM Profit Probably Jumped on Trans-Atlantic

Demand," *Bloomberg News*, February 15, 2006, at 1.

### DEFENDANTS KNEW THAT THEIR FUEL SURCHARGE PRICE INCREASES WERE FUNDAMENTALLY FLAWED, UNFAIR TO SHIPPERS, AND ADVERSE TO THE PUBLIC INTEREST

94.     In early 2000 IATA agreed among its members to establish a coordinated Fuel

Surcharge price index mechanism, which was based on variations in jet fuel spot prices. The

mechanism was intended to simultaneously raise Fuel Surcharge that IATA member Airfreight

Carriers levied on their Airfreight Customers when the fuel spot prices reached predetermined

levels and/or remained for a certain length of time at predetermined price levels.

95.     Subsequently, but prior to March 17, 2000, the IATA Tariff Coordinating

Conference applied to U.S. Department of Transportation ("U.S. DOT") seeking antitrust

immunity for the establishment, implementation and continuation of this "uniform, industry-wide

mechanism to surcharge cargo rates." U.S. DOT Order 2000-3-7, "Agreements adopted by the

Tariff Coordinating Conferences of the International Air Transport Association relating to cargo

rate matters," Docket OST-2000-6837-2 at 1.

96.     In a March 17, 2000 Order the U.S. DOT denied IATA and its members antitrust

immunity for their Fuel Surcharge index mechanism, and disapproved of the IATA index

mechanism as "*fundamentally flawed and unfair to shippers and other users of cargo air

transportation*" who could be subjected to "*unjustified and unwarranted rate increases*." *Id.* at

2 (emphasis supplied).

97.     The U.S. DOT further objected that the IATA mechanism was based on the spot

price variations, rather than on actual prices, which allowed IATA to report to the U.S. DOT a

fuel cost percentage increase over *five times higher than that reported for actual prices. See id.*

As the U.S. DOT Order stated:

19

Moreover, IATA's proposed index mechanism, which reflects the volatile nature of the spot market, is at best an imperfect measure of the impact of fuel price increases on carriers. ***Most carriers employ fuel hedging programs which they use to limit the effects of jet fuel price volatility*** and thus discipline their costs. Indeed, under these programs, ***many prudent carriers manage to hedge between 70-80 percent of their total fuel needs.*** . . . [T]he difference between the average actual fuel prices, as reported to the Department . . . increased about six percent, while ***IATA's index, based on spot market prices, showed a 34 percent increase over the same period***.

*Id.* (emphasis supplied).

98.    According to the U.S. DOT opinion in its denial of immunity, the IATA fuel surcharge mechanism agreement had "direct application in foreign air transportation," and that the resolution seeking antitrust immunity was "***adverse to the public interest***." *Id.* at 3 (emphasis supplied).

99.    Defendant IATA and all Airfreight Carrier Defendants therefore knew or should have known as of March 17, 2000 that such a coordinated spot-price Fuel Surcharge mechanism had been specifically denied antitrust immunity.

100.    Despite the U.S. DOT decision, and despite being on notice that a Fuel Surcharge price increase mechanism such as that proposed by IATA was not shielded from the antitrust laws of the United States and moreover was "fundamentally flawed," "unfair to shippers," and "adverse to the public interest," the Airfreight Carrier Defendants, with full knowledge by Defendant IATA, nevertheless concertedly established, implemented, and continued their agreed-upon and coordinated Fuel Surcharge price increases, based on spot prices.

## THE INVESTIGATIONS

101.    Beginning February 13, 2006 antitrust investigators from four continents, including the European Commission ("EC"), the DOJ, the U.S. Federal Bureau of Investigation ("FBI"), the Swiss competition authority Weko, U.K. antitrust officials, South Korea's Fair Trade Commission ("KFTC"), and the Competition Bureau of Canada, raided each of the above-named Defendants in an unprecedented, global investigation into Defendants' Surcharge cartel.

102.    A spokesperson for the DOJ stated that the "industry-wide" investigation focused on "the possibility of anticompetitive practices in the in the air cargo industry."

103.    On February 15, 2006 the EC released a statement declaring that "The Commission has reason to believe that the companies concerned may have violated (a European Union) treaty, which prohibits practices such as price fixing."

104.    British Airways admitted that it had received requests for information from the EC and the DOJ, that FBI agents raided its offices at John F. Kennedy Airport in New York, and that U.K. antitrust officials raided its offices at Heathrow airport in London.

105.    Air France-KLM confirmed on February 15, 2006 that EC officials had raided its offices in Paris.

106.    Japan Airlines announced that EC authorities had raided its offices in Frankfurt, Germany.

107.    Korean Air admitted that the KFTC had raided its South Korean offices.

108.    Asiana also confirmed that the KFTC had raided its South Korean offices, and admitted that the raid concerned fuel surcharges and price-fixing practices.

109.    Cathay Pacific stated that EC and DOJ officials had raided its offices in Frankfurt, Germany, Los Angeles and San Francisco.

110.    United Airlines admitted that EC investigators raided its Frankfurt, Germany offices.

111.    SAS confirmed that its Stockholm, Sweden offices had been raided by antitrust investigators.

112.    According to a *Forbes* article from February 16, 2006, Defendant SAS Group stated that it understood from the investigators that the investigation focused on the Airfreight Carriers' "agreements regarding certain surcharges to offset external cost increases, such as fuel surcharges, costs for additional security measures after the attack in the U.S. in September 2001

21

and surcharges for war-risk insurance premiums applied in conjunction with the outbreak of war

in Iraq in 2003." Kelly Olsen: "Update 7: Three Airlines Confirm Price Fixing Probe,"

*Associated Press – Forbes.com*, February 16, 2006, at 1.

113.    SAS Group also stated that "the EU has alleged that cooperation among airlines

began in 2000 and involved agreements about surcharges imposed by airlines to offset certain

external costs." *Id.*

## VIOLATIONS ALLEGED

114.    Plaintiff incorporates by reference as if fully set forth herein the allegations

contained in the preceding paragraphs of this Complaint.

115.    During the Class Period, the exact dates being unknown to Plaintiff, Defendants

engaged in a continuing agreement, understanding, and conspiracy in restraint of trade to

artificially raise, fix, maintain, and/or stabilize the prices of Fuel, Security, and War Risk

Insurance Surcharges, and possibly other surcharges, in the United States and throughout the

world in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

116.    In formulating and effectuating the alleged contract, combination, or conspiracy,

Defendants engaged in anti-competitive activities, the purpose and effect of which were to

artificially raise, fix, maintain, and/or stabilize the prices of Surcharges for Fuel, Security, and

War Risk Insurance Premiums.   These activities included the following:

a.    agreeing to charge prices of Surcharges at certain levels and otherwise to

fix, raise, maintain, and/or stabilize the prices of Surcharges charged in the United States and

throughout the world;

b.    charging Surcharges at the agreed-upon rates;

c.    signaling increases in the price of Surcharges by, *inter alia*, publicly

announcing Surcharge increases;

d.    moving prices of their Surcharges in lock-step; and

22

e.    announcing new Surcharge prices nearly simultaneously.

117.    During the Class Period, the Defendants increased, as a ratio to external costs –

and profits -- the Surcharges they charged.  These relative increases in Surcharges cannot be

explained by actual increases in fuel prices, security measures, or war risk premiums, or

supply/demand forces, but rather were the result of anticompetitive conduct.

118.    During the Class Period, Plaintiff and members of the Class paid Surcharges

directly to Defendants (or their agents, subsidiaries, and/or controlled affiliates).

119.    The illegal combination and conspiracy alleged herein has had the following

effects, among others:

a.    price competition in the charging of Surcharges has been restrained,

suppressed, and/or eliminated;

b.    price competition in the contracting of airfreight transportation has been

restrained, suppressed, and/or eliminated;

c.    Surcharges charged by Defendants have been fixed, raised, maintained,

and/or stabilized at artificially high, non-competitive levels; and

d.    members of the Class have been deprived of the benefit of free and open

competition.

## FRAUDULENT CONCEALMENT

120.    Throughout the relevant period, Defendants affirmatively and fraudulently

concealed their unlawful conduct against Plaintiff and the Class.

121.    Plaintiff and the members of the Class did not discover, and could not discover

through the exercise of reasonable diligence, that Defendants were violating the antitrust laws as

alleged herein until shortly before this litigation was commenced. Nor could Plaintiff and the

members of the Class have discovered the violations earlier than that time because Defendants

conducted their conspiracy in secret, concealed the nature of their unlawful conduct and acts in

furtherance thereof, and fraudulently concealed their activities through various other means and methods designed to avoid detection. The conspiracy was by its nature self-concealing.

122.    Only on or about February 13, 2006, when several Airfreight Carriers admitted being raided by the EC, the DOJ, the FBI, the Swiss competition authority Weko, U.K. antitrust officials, the KFTC, and the Competition Bureau of Canada, in a coordinated global investigation into the Airfreight Carriers' cartel was the existence of the conspiracy disclosed to the public. Plaintiff and the members of the Class could not have discovered the unlawful conduct at an earlier date through the exercise of reasonable diligence because of Defendants' active and purposeful concealment of their unlawful activities.

123.    Defendants engaged in a successful, illegal price-fixing conspiracy with respect to Surcharges, which they affirmatively concealed, in at least the following respects:

a.    by agreeing among themselves not to discuss publicly, or otherwise reveal, the nature and substance of the acts and communications in furtherance of their illegal scheme; and

b.    by giving false and pretextual reasons for their Surcharges and Surcharge increases during the relevant period and by describing such pricing falsely as being the result of external costs rather than collusion.

124.    As a result of Defendants' fraudulent concealment of their conspiracy, Plaintiff and the Class assert the tolling of any applicable statute of limitations affecting the rights of action of Plaintiff and the members of the Class.

## INJURY TO PLAINTIFF AND THE CLASS

125.    During the Class Period, Plaintiff and the members of the Class, because of Defendants' antitrust violations, paid Surcharges they would not have paid absent such violations. As a result, Plaintiff and the members of the Class it seeks to represent have been injured and damaged in their business and property in an amount to be determined according to

24

proof.

126.    As a direct and proximate result of the illegal conspiracy, Plaintiff and the members of the Class have been injured and financially damaged in their respective businesses and property, in that they have paid Surcharges during the Class Period they would not have paid in the absence of the illegal conspiracy.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff prays that:

A.    The Court determine that this action may be maintained as a class action under Rule 23(a) and (b) (3) of the Federal Rules of Civil Procedure;

B.    The Court adjudge and decree that the contract, combination and conspiracy alleged herein is a *per se* unreasonable restraint of trade in violation of Section 1 of the Sherman Act;

C.    Judgment be entered against Defendants, jointly and severally, and in favor of Plaintiff and the Class for damages as allowed by law as determined to have been sustained by them.

D.    Each of the Defendants, successors, assigns, parents, subsidiaries, affiliates and transferees, and their respective officers, directors, agents and employees, and all other persons acting or claiming to act on behalf of Defendants or in concert with them, be permanently enjoined and restrained from, in any manner, directly or indirectly, continuing, maintaining or renewing the combinations, conspiracy, agreement, understanding or concert of action, or adopting any practice, plan, program or design having a similar purpose or effect in restraining competition;

E.    The Court award Plaintiff and the Class attorneys' fees and costs, and pre-judgment and post-judgment interest as permitted by law; and

F.    The Court award Plaintiff and the Class such other and further relief as may be

necessary and appropriate.

## JURY TRIAL DEMAND

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff demands a trial by jury of all

of the claims asserted in this Complaint so triable.

DATED: February 23, 2006                          Respectfully submitted,

                                                  **COHEN, MILSTEIN, HAUSFELD
                                                  & TOLL, P.L.L.C.**

                                                  By:

                                                  Michael D. Hausfeld
                                                  Paul T. Gallagher
                                                  Andrew B. Bullion
                                                  1100 New York Avenue, N.W.
                                                  Suite 500, West Tower
                                                  Washington, D.C. 20008
                                                  Telephone: (202) 408-4600
                                                  Facsimile: (202) 408-4699

                                                  Anthony J. Bolognese
                                                  Joshua H. Grabar
                                                  Michael Gehring
                                                  **BOLOGNESE & ASSOCIATES, LLC**
                                                  1617 JFK Blvd., Suite 650
                                                  Philadelphia, PA 19103
                                                  Telephone: (215) 814-6750
                                                  Facsimile: (215) 814-6764

                                                  Steven A. Kanner
                                                  William H. London
                                                  Douglas A. Millen
                                                  **MUCH SHELIST FREED DENENBERG
                                                  AMENT & RUBENSTEIN, P.C.**
                                                  191 North Wacker Drive, Suite 1800
                                                  Chicago, IL 60606
                                                  Telephone: (312) 521-2000
                                                  Facsimile: (312) 521-2100

Marc H. Edelson
**EDELSON & ASSOCIATES, LLC**
45 West Court Street
Doylestown, PA 18901
Telephone: (215) 230-8043
Facsimile: (215) 230-8735

Ira Neil Richards
**TRUJILLO RODRIGUEZ**
  **& RICHARDS, LLC**
The Penthouse
226 West Rittenhouse Square
Philadelphia, PA 19103
Telephone: (215) 731-9004
Facsimile: (215) 731-9044

Daniel Cohen
**CUNEO GILBERT & LaDUCA, L.L.P.**
507 C Street N.E.
Washington, D.C. 20002
Telephone: (202)789-3960
Facsimile: (202)789-1813

*Attorneys for Plaintiff*